UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HOLLIS K. LITTLEJOHN, JR. | * | CIVIL ACTION NO. 24-1507 |
| | * | |
| VERSUS | * | DIVISION 1 |
| | * | |
| CAROLYN COLVIN, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | * * * | MAGISTRATE JUDGE JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

The plaintiff, Hollis K. Littlejohn, Jr., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been presented for decision by the parties' briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 12, 15, 16).[1] Because the Commissioner's decision was supported by substantial evidence, IT IS ORDERED that plaintiff's appeal is dismissed.

**Procedural Background**

Mr. Littlejohn applied for DIB on April 7, 2021, asserting a disability onset date of December 5, 2020. He alleged the following illnesses, injuries, or conditions: blind in left eye, ruptured disc in low back, herniated disc in low back, hearing loss in left ear, and depression. On January 27, 2022, his claim was denied by the state agency.

Mr. Littlejohn obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 29, 2023. On November 28, 2023, the ALJ issued an

---

[1] The undersigned magistrate judge has jurisdiction over this matter under 28 U.S.C. § 636(c) by consent of the parties. (Rec. Doc. 9).

1

adverse decision. Mr. Hollis timely appealed to the Appeals Council, which denied review on April 15, 2024.

On June 11, 2024, Mr. Hollis filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 7, 8). The parties filed briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 12, 15, 16). Mr. Hollis is represented by counsel.

## **Evidence in the Record**

1. *Function Reports and Hearing Testimony*

In conjunction with his application for DIB, Mr. Littlejohn and his wife each completed a "Function Report" regarding his conditions and limitations. R. at 273-88. Mr. Littlejohn reported that it is hard for him to read small print without his readers on and that he has to wear sunglasses often because his left eye is highly sensitive to bright lights. R. at 281. He has difficulty seeing anything to the left of him. Id.  He also reported that his back pain limits what he can do and that he is in constant pain. Id.  Mrs. Littlejohn reported that Mr. Littlejohn cannot work like he used to because he suffers in excruciating pain. R. at 273. Mr. Littlejohn reported that he is able to do small projects around the house when he is not working. R. at 282. He needs help filling his weekly pill box because he cannot see to read his prescription bottles. R. at 283. He drives only occasionally because he does not see that well. R. at 284. He tries not to lift anything heavier than 25 pounds because his back starts hurting badly. R. at 286.

Mr. Littlejohn appeared for a hearing before the ALJ on June 29, 2023. R. at 34. He was represented by a non-attorney representative. Id. Mr. Littlejohn was 52 at the time. R. at 39. He testified the highest education he had attained was completion of the 11th grade. Id.

Mr. Littlejohn worked for Titans of Industry performing construction work on concrete, tying rebar, and things like that from approximately 2015 until his alleged disability onset date of December 5, 2020. R. at 39-40. This work included building the forms into which the concrete was poured. R. at 41. Mr. Littlejohn testified that he left that job because of his back pain. R. at 41. Prior to his work with Titans of Industry, Mr. Littlejohn performed stick welding and fitting on ships for various employers since at least 2008. R. at 41.

Mr. Littlejohn testified that he was no longer able to work because he has back problems, he is blind in his left eye, and he has PTSD. R. at 46. He lost sight in his left eye when he was 19 years old and a victim of violent crime. Id. He can only see shadows with the left eye. R. at 47. The ALJ observed that Mr. Littlejohn had been able to perform a lot of work in the past even though he could not see out of his left eye. Id. Mr. Littlejohn responded that he quit because he needs to try and save his other eye as best he can and there is a lot of strain on the one eye that can see. Id. He also testified that he had recently been diagnosed with thinning of the cornea in both eyes. R. at 63. This causes both his eyes to hurt, but he had been prescribed eye drops. R. at 63. He explained that he wears sunglasses inside because sometimes there is too much light in certain rooms and it hurts his eyes. R. at 64.

He described his back pain as situated in his lower back. R. at 47. He recalled having a cortisone shot. R. at 47-48. He was going to do physical therapy, but he never did. R. at 48. His back pain radiates down his legs to his foot. R. at 53. He also experiences numbness in his foot. Id. He reported that because of his back pain, he cannot keep still. R. at 54. He cannot stand or sit for a long time. Id. He said he could stand for maybe 20 minutes before needing to sit down and then would need to stand up again after five to seven minutes. Id. He testified he could sit for five

or ten minutes in one position before having to shift his weight or change his position. Id. He can walk one city block before needing to take a rest for three to five minutes. R. at 55.

He also reported that he has neck pain that makes it hard to hold his arms higher than his shoulders. R. at 51-52. He reported that sometimes he has numbness in his fingertips. R. at 52. This causes him difficulty with gripping. R. at 54.

Mr. Littlejohn testified that he does not lift anything over ten pounds if he does not have to. R. at 55. He said he could not lift ten pounds for two thirds of the day over an eight-hour period. Id. He would need to take a break if he was picking up ten pounds over thirty minutes. R. at 56. He noted that he has to take a break when unloading groceries from his wife's car. Id.

He testified that at the time of the hearing, he was experiencing pain at a level of eight out of ten. R. at 59. But sometimes it might go up to ten or down to three. Id. He testified that his pain is at ten about two days a week and his pain is at eight about three days a week. R. at 60. He noted that if he takes his medicine properly it gets better. Id.

He takes medication for PTSD. R. at 48. He reported he also has anxiety but he was not sure if that was the same as his PTSD. R. at 49. He also explained that he has difficulty focusing on things, like if he had to sit down and read something. R. at 57. When asked if he had problems with his memory, he testified that his wife takes care of laying out his medication and his doctors' appointments. R. at 58-59. But he remembers to shower regularly. Id.

Mr. Littlejohn lives with his wife and their two cats and two dogs. R. at 49. He spends a typical day watching TV and maybe taking out the garbage and checking the mail. R. at 50. He handles his own personal hygiene. Id.  He drives. Id.  He is able to use a cell phone for calls and to text or go online. R. at 51.

Vocational expert Mary Downing testified at the hearing. R.at 65. She classified Mr. Littlejohn's past work as a Construction Worker I, DOT code 869.664-014, SVP 4, heavy duty, and Welder-Fitter, DOT code 819.361-010, SVP 7, medium duty. R. at 66.

The ALJ asked the vocational expert to consider a hypothetical person of the same age, education, and work history as Mr. Littlejohn, who could perform the full range of light exertional work activity, but can no more than frequently climb, stoop, and crouch; must avoid requiring binocular vision; and must avoid work functions requiring occasional depth perception and accommodation. R. at 66-67. She testified that such a person could not perform Mr. Littlejohn's past work, but he could perform work as a Cleaner, DOT code 323.687-014, SVP 2 light duty, with 177,783 jobs available in the national economy; Sales Attendant, DOT 299.677-010, SVP 2, light duty, with 173,859 jobs available in the national economy, and Price Marker, DOT code 209.587-034, SVP 2, light duty, with 136,783 jobs available in the national economy. R. at 67.

The ALJ asked the vocational expert to consider the previous individual with the additional limitation of being able to understand, remember, and carry out only simple, routine instructions. Id. The vocational expert testified that this would not change her prior opinion, but instead of the Sales Attendant, such a person could perform work as a Cafeteria Attendant, DOT number 311.677-010, SVP 2, light duty, with 19,096 jobs available in the national economy. R. at 67-68. The expert testified that if additional limitations of no fast paced quota-based work and only occasional changes in work setting were added, it would not change her opinion. R. at 68. But if the person was expected to be off task for an average of 15% of the workday in addition to standard breaks, there would be no competitive work in the national economy. Id.

Mr. Littlejohn's representative then asked the vocational expert to consider an additional limitation to only occasional ladders, ropes, scaffolds, stairs, ramps, balancing, stooping, kneeling,

crouching, and crawling. R. at 69. This would not change the expert's opinion. R. at 69-70. The vocational expert also testified that a limitation to occasional feeling would not change her opinion. R. at 70. But if the person was limited to only occasional handling, that would eliminate all the cited jobs. R. at 70-71.

If the person in the first hypothetical was limited to sitting only five hours in an eight hour workday, that would eliminate the Cleaner, Sales Attendant, and Cafeteria Attendant jobs and would require a reduction in the number of available Marker jobs. R. at 71.

2. *Medical Records*[2]

Dr. A.J. delaHoussaye at SEECA performed a consultative eye examination on May 11, 2011, on referral from Dr. Darren Duet. R. at 613. Mr. Littlejohn passed the stereopsis depth perception testing. R. at 614. Dr. delaHoussaye concluded that Mr. Littlejohn was able to function on the job with his vision. Id.

The next medical record on file concerning Mr. Littlejohn's eyes is from 2019. On July 23, 2019, Mr. Littlejohn presented at the Leon J. Chabert Medical Center Emergency Department with left eye pain and drainage. R. at 466. He reported a possible foreign body due to dealing with cement and saw dust the previous day. Id. He denied using medicated drops at home. Id. He had no photophobia and no changes to the right eye. Id. He was negative for redness and visual disturbance. R. at 467. Upon examination, his conjunctivae were normal; his left eye exhibited discharge but no chemosis, exudate, hordeolum, foreign body, or corneal abrasion. R. at 468. He was diagnosed with conjunctivitis and prescribed ofloxacin drops. Id. He was instructed to follow up with ophthalmology or return to the emergency department if his symptoms worsened. R. at 469.

---

[2] Because Mr. Littlejohn's appeal concerns the ALJ's findings regarding his eyes and vision, this summary of medical records focuses on those conditions.

Mr. Littlejohn presented to EYE LA for a yearly exam with Dr. Gerard Guidry on November 27, 2019. R. at 611. His previous visit was noted to be May 11, 2011.[3] Id. He reported cataracts and stated his vision was not good. Id. He could not see with his left eye. He was interested in cataract surgery. Id. He noted that his reading vision is the biggest problem, but overall it is getting more difficult to see. Id. Upon examination, he had a hazy cornea with traumatic mydriasis in the left eye. R. at 612. There was no stain or clouding of the cornea of the right eye. Id. Dr. Guidry concluded there was nothing that could be done for the left eye other than a completely black contact lens to improve light sensitivity. Id. Mr. Littlejohn agreed to consider a multifocal contact lens for the right eye as he was not ready for surgery yet. Id. As to Mr. Littlejohn's interest in surgery, Dr. Guidry explained that a premium lens is the only option for surgery to get the results he wanted. Id.

Mr. Littlejohn followed up with Dr. Brittany Landry at the Leon J. Chabert Medical Center for other medical conditions in February 2020, March 2020, September 2020, October 2020, December 2020, and February 2021. Upon a review of symptoms at each appointment, he was negative for visual disturbances and on physical examination, his conjunctivae were normal. R. at 378, 397, 391-92, 386, 417-18, 451.

On April 7, 2021, Mr. Littlejohn returned to EYE LA for a yearly eye exam. R. at 608. He reported he always has trouble with his eyes. Id. He cannot see out of his left eye and he does not wear anything for his right eye. Id. Dr. Guidry concluded that vision in Mr. Littlejohn's right eye could be corrected to 20/20 at distance and near. R. at 609. His right eye was stable and healthy. Id.

---

[3] It appears EYE LA and SEECA are associated.

Mr. Littlejohn followed up with Dr. Landry for other medical conditions in August 2021 and November 2021. His eyes were negative for visual disturbance and his conjunctivae were normal on examination. R. at 662-63, 669-70.

Meanwhile, Dr. William Fowler performed a consultative mental status examination on September 29, 2021. R. at 639. With regard to his vision, Mr. Littlejohn reported that he used to fill out paperwork himself, but now he has his wife do it due to vision problems or concerns about misspelling. R. at 640. He reported that he does not drive at night due to his vision. Id. Dr. Fowler's summary focused on Mr. Littlejohn's mental impairments and, other than mention a history of blindness in the left eye, did not address Mr. Littlejohn's vision. R. at 642.

Dr. Terry Pummer performed a consultative examination on November 13, 2021. R. at 647. With regard to his complaint of blindness in the left eye, Mr. Littlejohn reported he cannot see out of his left eye and experiences pain that is worsened by sunlight and bright lights. Id. He noted that symptoms are relieved by wearing sunglasses. Id. Dr. Pummer performed a Snellen Eye Test and assessed Mr. Littlejohn as blind in the left eye, 20/40 in the right eye, and 20/40 with both eyes. Id. He also performed various tests of Mr. Littlejohn's range of motion, strength, balance, etc. R. at 650-54. Dr. Pummer assessed Mr. Littlejohn's limitations and included postural limitations but found "no" visual limitations. R. at 654-55.

Mr. Littlejohn followed up with Dr. Landry on May 26, 2022. R. at 714. He was negative for visual disturbance. Id. On examination his conjunctivae were normal. R. at 716.

Mr. Littlejohn presented to Dr. Zachary Davis on July 11, 2022, for an eye screening. R. at 757. He reported both of his eyes were dry, but especially his left eye. R. at 758. He was diagnosed with dry eye on the left, where he also had central corneal thickening. Id.  His right eye had presbyopia, for which Dr. Davis recommended over-the-counter readers. Id.  Mr. Littlejohn was

8

also diagnosed with nuclear sclerosis in the right eye, but this was noted to be not visually significant ("NVS"). Id. Upon examination, Dr. Davis observed blepharitis bilaterally. R. at 760.

Dr. Scott Sondes performed a consultative evaluation on October 6, 2022. R. at 792-96. Upon physical examination, Mr. Littlejohn's visual acuity in left was 0 and on the right was 20/50, uncorrected. R. at 794. Extraocular movements were intact without nystagmus. Id. The left iris and cornea were cloudy and the pupil was nonreactive. Id. Dr. Sondes noted that Mr. Littlejohn was able to read, write, count money, and do simple arithmetic. R. at 795. When assessing Mr. Littlejohn's ability to perform work related activities, Dr. Sondes did not include any vision related limitations. Id. As to his eyes, Mr. Littlejohn was diagnosed with left eye blindness and no diagnosis as to the right eye. R. at 696.

Mr. Littlejohn presented to Total Urgent Care with eye pain on November 25, 2022. R. at 810. He also had eyelid redness and swelling. Id. He denied eye burning, vision changes, or eye discharge. Id. On examination of his eyes, sclera, lids, and lashes were normal. R. at 811. Injected conjunctiva in the right eye was noted to be abnormal. Id. He was assessed with unspecified keratitis. Id. He was prescribed Tobrex eye drops. Id.

Mr. Littlejohn presented at SEECA on November 28, 2022, for an emergency examination by Dr. delaHoussaye. R. at 831. He reported there may be something in his eye or it might be infected. Id. He reported that the eye drops he received at urgent care were not working. Id. His left eye was sensitive to light and touch, itching, burning, red, and crusty. Id. He was diagnosed with bullous keratopathy in the left eye with moderate thinning of the superior cornea due to dryness with no infection. R. at 832. He was prescribed Maxitrol eye drops. Id. It was noted that if his discomfort improved, they might do temporary tear savers in both the upper and lower lids of the left eye. Id.

Mr. Littlejohn followed up with Dr. delaHoussaye on November 30, 2022. R. at 829. He reported his eye felt a lot better than previously. Id. Temporary tear savers were inserted in both eyes. R. at 830. He followed up again on December 13, 2022, for permanent tear savers, which were inserted in both eyes. R. at 827-28

Mr. Littlejohn followed up with Dr. delaHoussaye on January 3, 2023, reporting that his eyes were too watery since having the tear savers placed. R. at 825. He was prescribed Alrex eye drops. R. at 826. He followed up again on January 19, 2023. R. at 823. He had only been using the eye drops for a week because of delays at the pharmacy. Id. He reported the watering was not as bad as before. Id.

Mr. followed up with Dr. delaHoussaye on February 16, 2023, reporting that his eyes were still watering but it had gotten much better. R. at 821. He reported that he was still using the eye drops but as needed. Id.

## Decision of the Administrative Law Judge

The ALJ found Mr. Littlejohn has the following severe impairments: multi-level degenerative disc disease/degenerative joint disease of the spine with radiculopathy, vision loss, depression, anxiety, post-traumatic stress disorder, learning disorder, and alcohol use disorder. R. at 15. However, the ALJ found that Mr. Littlejohn does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 16.

The ALJ then found Mr. Littlejohn has the residual functional capacity to perform light work except that he can only occasionally climb, stoop, kneel, crouch, and crawl. R. at 17. In addition, he must avoid work requiring binocular vision, along with work functions that require more than occasional depth perception and accommodation. Id. Further, he must avoid exposure

to hazardous work environments, such as unprotected heights and dangerous, moving machinery. Id. He can understand, remember, and carry out simple, routine instructions but most avoid fast-paced quota-based work. Id. Finally, he can only adapt to occasional changes in work setting. Id.

The ALJ found Mr. Littlejohn is unable to perform his past relevant work and that he has limited education. Transferability of job skills was not material to the determination. Relying on the vocational expert's testimony, the ALJ considered Mr. Littlejohn's age, education, work experience, and residual functional capacity and determined that there are jobs that exist in significant numbers in the national economy that Mr. Littlejohn can perform. Thus, the ALJ concluded that Mr. Littlejohn has not been under a disability as defined by the Act from December 5, 2020, through the date of the decision on November 28, 2023.

## Statement of Issues on Appeal

Issue No. 1.   Did the ALJ err in assessing Mr. Littlejohn's residual vision function?

## Analysis

### I. Applicable Law

#### a. *Entitlement to Benefits under the Act*

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the burden of proving that he is disabled within the meaning of the Act. Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir. 1987).

Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled.

11

See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.

An assessment of the claimant's residual functional capacity or "RFC" is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id. The RFC is an assessment of the most a claimant can still do despite his limitations and is determined based on all the relevant evidence in the case record. Id.; see 20 C.F.R. § 945(a)(1). At the hearing level, the ALJ is solely responsible for assessing RFC. 20 C.F.R. § 416.946(c); see Taylor v. Astrue, 706 F.3d 600, 602–03 (5th Cir. 2012).

### b. Standard of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez, 415 F.3d at 461. Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d

162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

**II.     Plaintiff's Appeal**.

*Issue No. 1.     Did the ALJ err in assessing Mr. Littlejohn's residual vision function?*

Mr. Littlejohn argues that the ALJ erred in finding that Mr. Littlejohn has the residual functional capacity to perform work which involves functions that require occasional depth perception and accommodation because the ALJ did not indicate how he concluded that Mr. Littlejohn is capable of occasional depth perception and accommodation. Mr. Littlejohn argues further that the ALJ did not indicate how the evidence shows that Mr. Littlejohn's vision impairments do not otherwise impact his ability to work. Mr. Littlejohn argues that the ALJ erred in failing to obtain an expert medical opinion regarding Mr. Littlejohn's visual impairments. He submits that the ALJ attempted to interpret the meaning of the medical data on his own. Mr.

Littlejohn argues that the ALJ failed to meet his duty to develop the record and engaged in lay speculation.

The Commissioner counters that substantial evidence supports the ALJ's findings. The Commissioner points out that the ALJ discussed Mr. Littlejohn's vision throughout his decision. The Commissioner argues that the treatment records support the ALJ's assessment of Mr. Littlejohn's visual limitations. The Commissioner cites Mr. Littlejohn's treatment with Dr. Guidry and Dr. delaHoussaye and the consultative examinations of Dr. Pummer and Dr. Sondes. The Commissioner submits that although the consultative examiners assessed no visual limitations, the ALJ gave Mr. Littlejohn the benefit of the doubt and found his visual limitations more restrictive. The Commissioner argues further that the ALJ did not improperly rely on his own interpretation of the evidence, but instead he properly determined whether Mr. Littlejohn met the statutory definition of disability.

The Court finds that substantial evidence supports the ALJ's residual functional capacity assessment. As the Commissioner rightly points out, the ALJ considered Mr. Littlejohn's treatment for vision problems, noting his annual examinations in April 2021 and July 2022, his urgent care treatment in November 2022 and his follow up treatment in December 2022 and 2023. The ALJ also considered the consultative examinations of Dr. Pummer and Dr. Sondes, which as noted by the ALJ, did not find any visual limitations impacting Mr. Littlejohn's ability to work.

Indeed, the medical records consistently show that although Mr. Littlejohn was blind in his left eye, he was able to function with the use of his right eye. As the ALJ observed at the hearing, Mr. Littlejohn worked over a period of decades with the use of only his right eye. And although the ALJ did not mention it in his opinion, this conclusion is supported by Dr. delaHoussaye's 2011

finding that Mr. Littlejohn was able to function on the job with his vision after he passed stereopsis depth perception testing.

Critically, there is no evidence to support finding any more restrictive visual limitations than assessed by the ALJ. Mr. Littlejohn was consistently without visual limitations when treating for other conditions with Dr. Landry. In April 2021, Dr. Guidry concluded that Mr. Littlejohn's right eye could be corrected to 20/20 at distance and near and that the right eye was stable and healthy. R. at 609. During his consultative examination with Dr. Pummer in November 2021, Dr. Pummer assessed Mr. Littlejohn with uncorrected vision of 20/40 in both eyes—the same as for his right eye alone. Dr. Davis assessed Mr. Littlejohn with presbyopia in the right eye, but he recommended over-the-counter readers for treatment. When Mr. Littlejohn treated with Dr. delaHoussaye from November 2022 through February 2023 for light sensitivity, itching, and burning in the left eye, Mr. Littlejohn reported improvement with treatment.

Mr. Littlejohn essentially complains that the ALJ erred in rejecting the opinions of the consultative examiners and instead imposing visual limitations consistent with the treatment record and the notes of the consultative examiners. Mr. Littlejohn contends that the ALJ should have rejected the opinions of Dr. Pummer and Dr. Sondes and then obtained a further opinion that would satisfy the ALJ. While the ALJ has a duty to fully and fairly develop the facts, reversal "is appropriate only if the applicant shows that he was prejudiced" by an ALJ's failure to do so. Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995). Moreover, a consultative examination is only required "if 'the record establishes that such an examination is *necessary* to enable the [ALJ] to make the disability decision.'" Hardman v. Colvin, 820 F.3d 142, 148 (5th Cir. 2016) (quoting Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987)). And the ALJ is not obligated to adopt a specific

15

physician's assessment in determining a claimant's residual functional capacity. Miller v. Kijakazi, No. 22-60541, 2023 WL 234773, at *4 (5th Cir. Jan. 18, 2023).

Under the facts of this case, the Court finds no such supplemental opinion was required. No further "logical bridge" or medical opinion is necessary to make the obvious connection between a person having vision in one eye and the person not being able perform functions requiring biopic vision. And even if there is no specific medical evidence to support finding that Mr. Littlejohn could perform work only occasionally requiring depth perception and accommodation as found by the ALJ, at most, this indicates the ALJ found Mr. Littlejohn to be more limited than he actually is because there is no evidence to support finding that Mr. Littlejohn's eye conditions resulted in any limitations to depth perception at all. To the contrary, his past ability to work with the use of one eye and his failure to invoke issues with depth perception as a symptom at any time support the ALJ's conclusion. At most, then, the ALJ imposed more restrictive limitations than warranted by the evidence. Thus, there is no prejudice to him that could support reversal. Because no evidence in the record suggests that a further consultative examination would have resulted in a finding of more severe visual limitations than incorporated by the ALJ in the residual functional capacity assessment, the Court finds the ALJ did not err in failing to order one. The ALJ's residual functional capacity assessment as to Mr. Littlejohn's visual impairments is supported by substantial evidence.

## Conclusion

Because the Commissioner's decision was supported by substantial evidence, IT IS ORDERED that Mr. Littlejohn's appeal is DISMISSED.

New Orleans, Louisiana, this 3rd day of January, 2025.

                                                Janis van Meerveld
                                            United States Magistrate Judge